# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| James McLean, | ) |
|       Plaintiff, | ) |
| v. | ) Docket no. 2:18-cv-00152-GZS |
| Delhaize America Distribution, LLC, | ) |
|       Defendant. | ) |

### ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Delhaize America Distribution, LLC's Motion for Summary Judgment (ECF No. 41). Having reviewed the record as well as the parties' legal memoranda, the Court DENIES the Motion for the reasons explained below.

**I.     LEGAL STANDARD**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In

determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. See Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation"). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993).

## II. FACTUAL BACKGROUND

James McLean began working as a supervisor for Delhaize America Distribution, LLC ("Delhaize") in February 2016. In that role, McLean oversaw food product shipping and receiving crews at one of Delhaize's distribution centers. McLean reported to Dan Thyng, a manager, who, in turn, reported to Bruce Southwick, the general manager of the distribution center. Unlike McLean and his superiors, the associates in McLean's crews were unionized.

McLean, Thyng, and Southwick managed many of the distribution center's day-to-day operations but were not involved in the approval process for associates' Family Medical Leave

2

Act ("FMLA") leave requests. Instead, two separate departments called the Associate Service Center and Leave Administration Department (collectively, "the ASC") handled that process. Ordinarily, when the ASC made changes to associates' authorized leave, it would apprise Becky Shaw, the distribution center's office coordinator, who would relay the new leave information to the supervisors. Those supervisors had access to the company's FMLA database, which they used to track their associates' use of leave time.

On December 13, 2016, the ASC approved a request for intermittent FMLA leave made by one of McLean's associates, BG.[1] The approval permitted BG to take leave two times per year for up to three days each time so that he could provide medical care for his son. Neither the request nor the approval mentioned BG's assigned schedule, which remained 2:30 p.m. to 10:30 p.m. on Monday through Friday. On December 19, 2016, BG submitted a schedule change request form to McLean, which sought to amend BG's start time to 3:30 p.m. BG wrote "[p]roviding care for my son (FMLA related)" as the reason for the request. (Dep. Ex. 3 (ECF No. 37-12), PageID # 650.) McLean accepted BG's explanation without further investigation and approved the change. As a supervisor, McLean had authority to modify associate schedules.

On February 1, 2017, Southwick met with BG to discuss concerns regarding BG's poor attendance record. Faced with the possibility of termination, BG told Southwick about his son's health and that he had already requested expanded FMLA leave from the ASC. This new request, like BG's first, sought intermittent leave as opposed to a reduced schedule. Southwick ultimately chose not to punish BG and instructed him to continue working through the FMLA process.

After this meeting, either at the end of February or during the first week of March 2017, McLean received a report of what he considered to be an offensive ethnic slur from one of his

---

[1] To protect the associate's privacy, the parties refer to him as "BG" in their filings and the Court will do the same.

associates. The associate, who was of Mexican heritage, told McLean that another supervisor, JB, referred to the associate as "[m]y Mexican" or "[c]hico." (MHRC Charge (ECF No. 52-1), PageID # 1475.) The associate also informed McLean that he wanted to avoid involving the union. McLean relayed this information to Thyng who assured McLean he would take care of it. Delhaize policy requires managers who "receive complaints" of "discrimination" to inform an "Associate Relations representative." (Dep. Ex. 9 (ECF No. 37-12), PageID # 658.) Despite this, Thyng spoke with JB and did not report the allegation to anyone else.

On March 6, 2017, the ASC approved BG's new FMLA request and granted him four days of intermittent leave per month. On the same day that BG received this new approval, Thyng met with McLean to discuss BG's continued schedule issues. The exact origins of this meeting (the "March 6 meeting") are unclear.[2] What is clear is that at the March 6 meeting, Thyng told McLean that BG was coming in late and instructed McLean to make sure that BG arrived by the 3:30 start time. McLean met with BG later that day and informed BG that he needed to be at work by 3:30. After this meeting, BG prepared another schedule change request form seeking an even later start time of 4:30 p.m. Upon submitting it to McLean, BG stated he would be unable to make it to work by 3:30 and that the change was necessary for his son's medical care. McLean approved the change without further investigation or consultation with Thyng.

On March 7, 2017, Thyng learned about the new modified schedule. That same day, Southwick met with Thyng and learned that McLean "did not get [BG] back on the schedule that

---

[2] Southwick claims that he ordered Thyng to hold the March 6 meeting based on conversations with Shaw and Thyng. By Southwick's account, Shaw notified him that McLean had granted BG a modified schedule despite that BG's FMLA approval only allowed for intermittent leave. Southwick recalls being concerned by this because he felt they should "follow [BG's] FMLA to the tee." Southwick Dep. I (ECF No. 37-2), PageID # 267. He also remembers a pre-March-6-meeting discussion with Thyng in which they agreed that BG needed to get "back on his regular schedule" and that Thyng would instruct McLean to make that happen. Id. at PageID # 265. However, Thyng's recollection of the impetus for the March 6 meeting does not include a discussion with Southwick. Thyng remembers that he held the March 6 meeting after Shaw told him that BG was often arriving late for his 3:30 start time.

4

[Thyng] and [McLean] talked about" and had granted BG a 4:30 start time. (Southwick Dep. I (ECF No. 37-2), PageID # 267.) Southwick claims he was "surprised" to hear this and that he and Thyng agreed that McLean needed to "put [BG] back on the schedule" that Thyng and McLean had discussed. (Id. at PageID # 269.) On the evening of March 7, after meeting with Southwick, Thyng told McLean that BG's new modified schedule was disapproved and instructed him to tell BG. McLean pushed back on the disapproval by telling Thyng that BG was "entitled to FMLA" and that the change would not hinder operations. (MHRC Charge at PageID # 1476.)

On March 8, 2017, McLean informed Geoff Morin, a Union Representative, and Deborah Salamone, another supervisor, that they needed to meet with BG during BG's shift. Later that evening, McLean began speaking with Morin and BG in a conference room while Salamone finished a conversation elsewhere. McLean told BG that Thyng had disapproved the most recent schedule change and that, from then on, BG needed to be at work by 3:30. BG responded by telling McLean that he would be late the next two nights. McLean was not scheduled to work either night, but he knew that Salamone was. About five minutes into the meeting (the "March 8 meeting"), McLean asked Salamone to join them in the conference room. In McLean's recollection, he then showed Salamone the schedule change form that Thyng had marked as disapproved and told her that BG would be late for his 3:30 shift the next two nights.[3] Salamone ultimately indicated that she would have to mark BG tardy if he came in late.

On March 9, 2017, Salamone met with Thyng and Shaw in Shaw's office. Salamone explained that she was upset about the previous night's meeting, recounted what happened, and

---

[3] The Court acknowledges a genuine dispute of fact on this issue because Salamone offers a different account. Specifically, Salamone denies that McLean ever showed her the form. She remembers that McLean asked her to "okay" two late starts for BG without mentioning Thyng's schedule change disapproval, and that she approved the late starts on the condition that BG work full shifts. Salamone Dep. (ECF No. 37-5), PageID # 437. By her account, McLean only told her about Thyng's disapproval when, in response to Morin's request that she confirm her permission for the late starts, she asked if she was "missing" something. Id. at PageID # 438.

5

later prepared a written statement memorializing her account. In that statement, she wrote that "Jim McLean asked me if I minded if [BG] came in late Thursday 3/09/17 and Friday 3/10/17," that she initially approved the late starts, and that she changed her mind upon hearing about the recently disapproved schedule change. (Dep. Ex. 7 (ECF No. 37-12), PageID # 655).

After speaking with Salamone, Thyng called Southwick to inform him about the March 8 meeting. Thyng told Southwick that McLean had asked Salamone to "approve" an actual schedule change form for BG without first telling her about the earlier disapproval. (Thyng Dep. (ECF No. 37-4), PageID # 371.) Southwick was "shocked that [McLean] didn't carry out what he was supposed to do" and "shocked even more that he would put his peer in that situation." (Southwick Dep. I at PageID # 271.) On March 10, 2017, Southwick and Thyng met with McLean regarding the March 8 meeting. McLean relayed his recollection of the meeting, including that he told BG that he needed to be at work by 3:30, both verbally and in writing. After listening to McLean, Southwick and Thyng told McLean he "was not being truthful" and accused him of "lying" that he had told BG that his schedule change request was denied. (MHRC Charge at PageID # 1477.)[4]

---

[4] Defendant asks the Court to strike paragraphs 66, 67, 68, 71, 75, and 117 of Plaintiff's Statement of Material Facts by invoking the First Circuit's "sham affidavit" rule. See Def.'s Rep. to PSMF (ECF No. 55), PageID #s 1525-1527, 1529-1530, 1542. Under that rule, "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory." Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994). However, "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26 (1st Cir. 2002). Defendant argues that these paragraphs, which rely on Plaintiff's MHRC Charge sworn on August 10, 2017, and Plaintiff's affidavit sworn on March 12, 2019, contradict Plaintiff's deposition testimony from October 30, 2018. See PSMF (ECF No. 52), PageID #s 1458-1459, 1465. The Court concludes that these paragraphs do not violate the sham affidavit rule. First, as to the paragraphs that rely on the MHRC Charge, McLean swore to the facts in the Charge prior to his deposition, which indicates that it "was not prepared to manufacture a factual dispute for purposes of opposing summary judgment." Campbell v. CGM, LLC, No. 15-cv-088-JD, 2017 WL 78474, at *2 (D.N.H. Jan. 9, 2017). Second, neither the Charge nor affidavit "clearly" contradicts McLean's deposition testimony. Colantuoni, 44 F.3d at 5. In Defendant's view, McLean provided clear testimony that neither his March 10 written statement nor his written termination appeals (the "earlier written statements") "omitted" information relevant to his claims. McLean Dep. (ECF No. 37-1), PageID # 225. Given that the Charge and affidavit contain information that does not appear in the earlier written statements—mostly related to McLean's medical leave concerns for BG—Defendant contends that the Charge and affidavit contradict McLean's testimony. However, as McLean also testified that the earlier written statements were not a "verbatim" account of his various meetings, the Court construes his deposition as ambiguous regarding those statements' completeness. Id. Thus, to the extent the paragraphs rely on the Charge or

At the end of the March 10 meeting, Southwick told McLean that he would be suspended pending further investigation. Southwick then examined McLean's performance review and spoke with several managers about McLean. During his investigation, Southwick spoke with Thyng but not Morin or BG.[5] Ultimately, Southwick decided to terminate McLean. Before doing so, Southwick prepared a "recap" document for management in which he listed several perceived issues with McLean's performance. As part of a paragraph on "insubordination" he wrote that "Dan Thyng directed [McLean] to disapprove a schedule change for an associate, after the HR Partner had already worked with [McLean] to disapprove any deviation from the assigned schedule." (Dep. Ex. 22 (ECF No. 37-13), PageID # 713.) He also noted that, at the March 8 meeting, "[McLean] put his peer, Deb Salamone, in a difficult situation, by asking her, if she would approve of the schedule change that [Thyng] had already denied" which "is a clear example of insubordination, along with [McLean] knowingly diverting his responsibility onto his peer." (Id.) On March 22, 2017, Thyng met with McLean at Southwick's direction and told McLean he was being terminated for "insubordination." (Southwick Dep. II (ECF No. 37-3), PageID # 318.)

McLean filed two internal company appeals, which Delhaize denied. During consideration of the second appeal, Southwick outlined his reasons for the termination in an email. Therein Southwick wrote that although two people, an "HR partner" and Thyng, asked McLean to tell BG about the schedule change disapproval, McLean failed to follow either instruction. (Dep. Ex. 25 (ECF No. 37-13), PageID # 720.) Southwick also indicated that "[Thyng] and [McLean] discussed the plan to communicate with the understanding there would be no further discussion on this

---

affidavit for information not found in the earlier written statements, the Court concludes that they merely expand on "opaque" testimony. Gillen, 283 F.3d at 26. As a result, the Court DENIES Defendant's requests to strike the above listed paragraphs.

[5] Southwick testified at his deposition that he spoke with a few "managers" during the investigation including "of course Dan Thyng." Southwick Dep. I at PageID # 281.

7

matter. [McLean] was insubordinate when he decided not to follow through on the communication to the associate." (Id.) Southwick recalls that he did not consider "disciplining" McLean when he first learned of the new modified schedule on March 7, 2017. (Southwick Dep. I at PageID # 269.) Prior to the events of March 2017, McLean's job was not in "jeopardy" as Delhaize had never disciplined him or found him to be insubordinate. (Id. at PageID # 270.)

### III. DISCUSSION

Plaintiff alleges that Defendant terminated him in retaliation for protected conduct in violation of several federal and state statutes. Those statutes include 42 U.S.C. § 1981 (Count I); Title VII, 42 U.S.C. § 2000e *et seq.* (Count II); the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.* (Count III); the FMLA, 29 U.S.C. § 2601 *et seq.* (Count IV); the Maine Family Medical Leave Requirements ("FMLR"), 26 M.R.S.A. § 843 *et seq.* (Count V); and the Maine Whistleblowers' Protection Act ("WPA"), 26 M.R.S.A. § 831 *et seq.* (Count VI). Plaintiff presses two theories of recovery on each of these claims: intentional retaliation and the so-called "cat's paw." Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 68 (1st Cir. 2015). Considering the facts described above, the Court first evaluates the viability of Plaintiff's retaliation claims under his "cat's paw" theory.

#### A. Framework

Federal courts generally analyze employment retaliation claims at the summary judgment stage using the McDonnell Douglas burden-shifting framework.[6] This framework first requires the plaintiff to establish a "prima facie case" of retaliation. Theriault v. Genesis HealthCare LLC,

---

[6] A possible exception to this rule is that Maine courts have developed a "Maine-specific retaliation paradigm" for WPA cases. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 351 (1st Cir. 2018). Recognizing the open question regarding whether a federal court is required to conduct a McDonnell Douglas tripartite analysis, rather than the more streamlined analysis announced in Brady v. Cumberland County, 126 A.3d 1145 (Me. 2015), the Court here structures its analysis in accordance with McDonnell Douglas. As the First Circuit has explained, there is no substantive difference between the McDonnell Douglas and Brady frameworks, instead "[t]he proof is simply arranged in a different way." Theriault, 890 F.3d at 351.

8

890 F.3d 342, 350 (1st Cir. 2018). To do so, the plaintiff must produce evidence that: (1) he or she engaged in relevant protected conduct; (2) he or she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. See Theriault, 890 F.3d at 349 (WPA); Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 73 (1st Cir. 2011) (§ 1981); Brown v. Hartt Transp. Sys., Inc., 725 F. Supp. 2d 210, 230-231 (D. Me. 2010) (FMLA & FMLR); Lakshman v. Univ. of Me. Sys., 328 F. Supp. 2d 92, 113 (D. Me. 2004) (Title VII & MHRA). If the plaintiff succeeds, "[t]he burden of production then shifts to the defendant to identify a legitimate reason for the adverse employment action." Theriault, 890 F.3d at 350. Lastly, at the third step, the burden reverts to the plaintiff who must show that the defendant's reason is "a pretext" and the adverse action resulted from "the defendant's retaliatory animus." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004).

**B. Cat's Paw**

The "cat's paw" theory of liability allows a plaintiff to hold an employer liable for retaliation where a non-decisionmaker's retaliatory bias "impermissibly tainted" an adverse employment action. Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 88 (1st Cir. 2004). Ordinarily, this theory comes into play where a plaintiff cannot show that the actual decisionmaker knew about the plaintiff's protected conduct prior to taking an adverse action.[7] See Ameen, 777 F.3d at 70-71. The Supreme Court recently outlined the "cat's paw" theory thusly: "if a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an

---

[7] Whether Plaintiff has produced trial worthy circumstantial evidence that Southwick knew about Plaintiff's protected conduct prior to the termination is, at best, a close question here. See Cormier v. Genesis Healthcare LLC, 129 A.3d 944, 951 (Me. 2015) (finding sufficient circumstantial evidence of knowledge where decisionmaker had created a "communication pathway" to herself on the type of complaint that the plaintiff made); Brady, 126 A.3d at 1153 (finding sufficient circumstantial evidence that decisionmaker knew of protected activity where employee who received complaint "reported to" decisionmaker). As noted *infra*, the Court ultimately declines to resolve this question as to Plaintiff's claims.

9

adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011).

In Staub, the Court applied a proximate cause standard because the claim at issue required the plaintiff to show that unlawful bias was a "motivating factor" in the adverse decision. See id. at 419 (discussing how the "motivating factor" standard under the Uniformed Services Employment and Reemployment Rights Act of 1994 is akin to the traditional proximate cause standard in tort). However, in the context of statutes such as Title VII, which apply a more stringent "but-for" standard of causation to retaliation claims, Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013), courts have amended the "cat's paw" framework to require that level of causation. See, e.g., Thomas v. Berry Plastics Corp., 803 F.3d 510, 516 n.8 (10th Cir. 2015); Zamora v. City of Hous., 798 F.3d 326, 333 (5th Cir. 2015); Seoane-Vazquez v. Ohio State Univ., 577 F. App'x 418, 428 (6th Cir. 2014). Precise causation standard notwithstanding, the "cat's paw" theory requires a plaintiff to produce evidence that: (1) a non-decisionmaker motivated by retaliatory animus committed an act intending to cause an adverse employment action; and (2) such act caused an adverse action. See Ameen, 777 F.3d at 70-71.

Layering this theory into the McDonnell Douglas framework, the Court concludes that Plaintiff has made a prima facie case. Defendant does not dispute the first two elements. As for the third, the close temporal proximity between McLean's protected statements to Thyng—the discrimination referral and FMLA advocacy—and the termination allows an inference of causation. See Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 85 (1st Cir. 2006) (noting that "[t]emporal proximity can create an inference of causation in the proper case"); see also Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007) (explaining that burden at prima facie stage is "relatively light"). The Court also assumes, *arguendo*, that

Defendant's proffered reason for the termination—that McLean was insubordinate from Southwick's "point of view"—is legitimate and non-retaliatory. (Def. Mot. at PageID # 1025.)

At the third step, Defendant challenges whether there is trial worthy evidence as to intent and causation. The Court addresses these required elements in turn.[8]

i. **Retaliatory Intent**

The record reflects a factual dispute as to Thyng's retaliatory intent. According to the First Circuit, "determinations of motive and intent . . . are questions better suited for the jury, as proof is generally based on inferences that must be drawn, rather than on the proverbial smoking gun." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 34 (1st Cir. 1990) (internal citations and quotations omitted). Here, there is evidence supporting the inference that Thyng lied to Southwick about McLean's actions in retaliation for McLean's protected conduct. As an initial matter, the discrepancy between Salamone's account of the March 8 meeting and Thyng's description of that account to Southwick suggests that Thyng lied to Southwick about Salamone's story. Salamone wrote in her statement—and later testified that—McLean asked her to allow two late starts for BG

---

[8] The Court notes that it is not convinced that the pretext portion of the typical McDonnell Douglas burden-shifting framework is helpful in "cat's paw" cases. As the Fifth Circuit has explained, "[i]n *every* case involving a cat's paw theory of causation, the ultimate decisionmaker bases his decision on a non-retaliatory reason. Indeed, that is why cat's paw analysis is needed." Zamora, 798 F.3d at 335. Thus, rather than the technical veracity of the employer's explanation, it makes more sense to focus on causation in this context. That is, whether the decisionmaker acted as the "conduit" for the supervisor's retaliatory intent such that the supervisor's intent caused the adverse action. Harlow v. Potter, 353 F. Supp. 2d 109, 115 (D. Me. 2005). However, to the extent that a plaintiff is required to produce evidence of pretext, McLean has done so. Pretext entails "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons. Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 37 (1st Cir. 2010) (internal citations and quotations omitted). Defendant contends that it fired Plaintiff because McLean was insubordinate from Southwick's "point of view." Def. Mot. at PageID # 1025. However, Southwick has not kept his story straight on insubordination. Although Southwick originally asserted that McLean was insubordinate on March 8 because he asked Salamone to approve the denied schedule change, he later testified that McLean was insubordinate by asking Salamone to let McLean come in late "the next two days." Southwick Dep. II at PageID # 330; see Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) (internal citations and quotations omitted) (indicating that "[s]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext"). Southwick also testified that he gave his superiors false information when he told them that an "HR partner" had asked McLean to inform BG of the schedule change denial. Southwick Dep. II at PageID # 326. These "inconsistencies" call into question Southwick's belief in McLean's insubordination and, therefore, whether Defendant's termination explanation is pretext. Carreras, 596 F.3d at 37.

at the March 8 meeting. However, that is not what Thyng told Southwick. By Thyng's account, he called Southwick after speaking with Salamone and told him that McLean had asked Salamone to approve the actual schedule change request that Thyng had already denied. As McLean's conduct can be seen as much more insubordinate in Thyng's description than in Salamone's, a jury could find that Thyng's description was "misleading." Cariglia, 363 F.3d at 83.

There is also evidence from which a jury could infer that Thyng offered this misleading description to Southwick in retaliation for McLean's protected activity. Thyng's willingness to engage in deceptive conduct regarding McLean signals that Thyng was acting out of retaliatory animus toward him. See Awugah v. Key Bank Nat'l Ass'n, No. 2:12-cv-97-DBH, 2013 WL 950694, at *5 (D. Me. Mar. 12, 2013) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 147 (2000)) (finding that "the [supervisor's] willingness to implicate [the plaintiff] falsely might also be taken as proof of a retaliatory animus"). Moreover, the timing of Thyng's misleading description fell "hard on the heels" of McLean's protected activity—within forty-eight hours from the medical leave advocacy and as little as a few days from the discrimination referral—which permits a strong inference that Thyng's animus derived from McLean's protected activity. Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 50 (1st Cir. 2010) (internal citations and quotations omitted) (concluding that span of about ten days between first protected act and termination permitted inference of retaliatory intent); see Nakai v. Wickes Lumber Co., 906 F. Supp. 698, 706 (D. Me. 1995) (finding factual dispute on intent where "sequence of events" leading to discharge "began within a day or two" of the plaintiff's protected activity).

What is more, the record indicates that McLean never faced discipline with Delhaize prior to his protected conduct in March 2017, and that Thyng failed to follow company protocol after McLean referred the discrimination charge to him. See Welch v. Ciampa, 542 F.3d 927, 941 (1st

12

Cir. 2008) (citing the plaintiff's "spotless employment record" prior to protected conduct and adverse action as evidence of retaliatory motive in First Amendment retaliation case); Dubuche v. Emery Worldwide Airlines, Inc., No. Civ. 00-556-B, 2002 WL 31268395, at *10 (D.N.H. Oct. 9, 2002) (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 169 (1st Cir. 1998)) (noting that "departure from [the defendant's] normal policies and procedures tends to support an inference of a retaliatory motive"). Mindful that "courts must be particularly cautious about granting the employer's motion for summary judgment" in cases where intent is at issue, the Court concludes that this evidence meets Plaintiff's burden as to retaliatory intent. Hodgens, 144 F.3d at 167 (internal citations and quotations omitted); see Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 34 (1st Cir. 2012) (deeming summary judgment "improvident" in retaliation case after viewing "the record as a whole").

### ii. Causation

The Court need not separately address the causation standard of each statute underlying Plaintiff's claims because, as explained *infra*, the record permits an inference that Thyng's misleading conduct was the "but-for" cause of Plaintiff's termination. See Gourdeau v. City of Newton, 238 F. Supp. 3d 179, 192 n.17 (D. Mass. 2017) (explaining that "but-for" standard is more stringent than either the "negative or motivating-factor" employment law standards).

To establish "but-for" causation within the "cat's paw" retaliation framework, a plaintiff must present evidence that the employer would not have taken the adverse action in the absence of the supervisor's retaliatory act or acts. See Zamora, 798 F.3d at 332 (internal citations and quotations omitted) (noting that "the supervisor's act must be a [but-for] cause of the ultimate employment action"); see also Velazquez-Perez v. Developers Diversified Realty Corp., 753 F.3d 265, 278 (1st Cir. 2014) (explaining that but-for causation in the retaliation context requires a

13

showing that the plaintiff "would not have been fired had he not complained"). Here, a fact finder could conclude that Southwick's termination decision hinged on a misunderstanding of McLean's conduct created by Thyng's retaliatory deception.

Southwick testified at his deposition that, prior to hearing about the events of March 8, he did not consider "disciplining" McLean for approving a new modified schedule for BG on March 6. (Southwick Dep. I at PageID # 269.) This suggests that Southwick would not have fired McLean if he had not concluded that McLean engaged in insubordination at the March 8 meeting. With respect to that conclusion, Southwick initially cited two actions he believed McLean took on March 8 that amounted to insubordination: his request that Salamone "approve of the schedule change that [Thyng] had already denied" and his refusal to "communicate the denial of a schedule change" to BG. (Dep. Ex. 22 at PageID # 713; Dep. Ex. 25 at PageID # 720.) Crucially, there is evidence showing that Plaintiff did neither of those things. McLean claims that he told BG about the disapproval during the March 8 meeting and the Court discerns no facts to the contrary. Also, as noted in the intent section *supra*, neither Salamone's written statement nor her testimony indicate that she ever accused McLean of asking her to approve an actual schedule change.

This record precludes summary judgment on causation because it establishes a dispute as to whether Southwick would have terminated McLean if Thyng had not deceived him. Before Thyng's misleading description of Salamone's story, McLean's job was not in jeopardy. That suggests that if Thyng had not skewed the story, Southwick would not have had a reason to terminate McLean. See Higgins v. Town of Concord, 322 F. Supp. 3d 218, 229 (D. Mass. 2018) (finding dispute as to causation in a "cat's paw" retaliation case where the plaintiff had exemplary work history and employer only began to take adverse actions against her "around the time" of the protected activity). Indeed, both actions that Southwick originally listed as the basis for McLean's

insubordination on March 8 appear to have been imputed to McLean based on Thyng's inaccurate portrayal of events.  First, Southwick's determination that McLean asked Salamone to approve "the schedule change that [Thyng] had already denied" merely parroted Thyng's narrative. (Dep. Ex. 22 at PageID # 713.)  Second, given Thyng's implication that McLean's goal was to get a new schedule change approval for BG, a fact finder could conclude that the false narrative led Southwick to discredit McLean on the issue of "communicat[ing] the denial" to BG. (Dep. Ex. 25 at PageID # 720.)  Therefore, drawing all reasonable inferences in the nonmovant's favor, a jury could find that Southwick would not have terminated McLean if Thyng had not misled him.  See Cariglia, 363 F.3d at 87 (holding that subordinate's bias may be imputed to employer where decisionmaker relies on misleading information from subordinate in taking adverse action).

In sum, Plaintiff has put forward trial worthy evidence regarding the two elements of "cat's paw" retaliation: (1) retaliatory intent; and (2) causation.  See Ameen, 777 F.3d at 70-71.  Summary judgment would be inappropriate as to any of Plaintiff's claims under these circumstances.  The Court recognizes that the briefing dedicates substantial space to the trial worthiness of Plaintiff's intentional retaliation theory.  However, as the Court concludes that Plaintiff has met his burden under the "cat's paw" theory, it "need not pass on the viability" of intentional retaliation.  In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 51, 59 n.4 (1st Cir. 2013).

### IV.    CONCLUSION

Accordingly, the Court DENIES Defendant's Motion for Summary Judgment (ECF No. 41) and Defendant's requests to strike in the Reply to PSMF (ECF No. 55).

SO ORDERED.

                                           /s/ George Z. Singal  
                                           United States District Judge

Dated this 27th day of August, 2019